**Richard E. Clark, Esq., State Bar No. 009052**
**2942 N.24th St., Ste. 109**
**Phoenix, Arizona 85016**

**E-mail: richardc@theaomgroup.com**
**Phone: 602-325-8361**
**FAX: 602-293-3801**

**Attorney for Sherryl Madison**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **In Re:**<br>**SHERRYL MADISON,**<br>**Debtors** | In proceedings under Chapter 13<br><br>**BK Case No. 09-22225**<br>**Adversarial Case No. 2-09-ap-01535-SSC** |
| **SHERRYL MADISON,**<br>**Plaintiffs,**<br><br>**V.**<br>**Mortgage Electronic Registration Systems, INC WELLS FARGO BANK, N.A. as Trustee under Pooling and Servicing Agreement Dated as February 1, 2006, Securitized Asset Back Receivables LLC Trust 2006-FR-1 Mortgage Pass-Through Certificates, Series 2006-FR1, Fremont Investment & Loan Company, HomEq Servicing Corporation, Ticor Title Co., Michael A. Bosco, Jr.,**<br><br>**Defendants.** | **ADVERSARIAL COMPLAINT TO DETERMINE VALIDITY OF LIEN ON PROPERTY, AND QUIET TITLE** |

**NOW COMES,** Sherryl Madison with her Adversarial Complaint hereby states and alleges as follows:

## JURISJICTION AND VENUE

1. The court has jurisdiction over this matter pursuant to 28 USC 157 and Fed. R. Bank. P. 7003.
2. Pursuant to 28 U.S.C. 157(b)(2)(I) and (J), this adversary proceeding constitutes a "core" proceeding over which this Court has jurisdiction to enter final judgment.
3. Pursuant to 28 U.S.C. 1409(a), venue in this Court is proper.

## PARTIES

4. Plaintiff in this cause of action is Sherryl L. Madison who is also Homeowner of the subject property located at 522 E. Glendale Avenue, Phoenix, AZ., 85020 Legally described as lot 2, DIANA ESTATES, According to Book 48 of Maps, Page 49, records of Maricopa County, Arizona. EXCEPT that portion of said Lot 2 lying Southerly of the line described as follows: BEGINNING at the Northeast corner of the South 10 feet of said Lot 2: Thence Westerly along the North line of said South 10 feet to the West line of the East 90.48 feet of said lot; Thence Westerly to a point in the West line of said Lot that is 8.10 feet Northerly of the Southwest corner thereof and the terminus of the line herein described. Parcel No. 2: The West 4 feet of that part of Lot 1, DIANA ESTATES, According to Book 48 of Maps, Page 49, records of Maricopa County, Arizona, lying South of the Easterly prolongation of the North line of Lot 2, DIANA ESTATES. EXCEPT the South 10 feet thereof.
5. **Mortgage Electronic Registration Systems, Inc.** (hereinafter MERS), a defendant in this case is a Delaware corporation transacting business in Arizona unauthorized with its principal place of business in Virginia and another in Florida.
6. **WELLS FARGO BANK, N.A. as Trustee under Pooling and Servicing Agreement Dated as February 1, 2006, Securitized Asset Back Receivables LLC Trust 2006-FR-1**

**Mortgage Pass-Through Certificates, Series 2006-FR1,** a defendant in this case, is a California based corporation, transacting business in the State of Arizona.

7. **Fremont Investment and Loan Company**, a defendant in this case, is a California based corporation transacting business in the State of Arizona.
8. **HomEq Servicing Corporation**, a defendant in this case, is a New Jersey based corporation transacting business in the State of Arizona.
9. **Ticor Tile Agency of Arizona Inc,** a defendant in this case is an Arizona based company.
10. **Michael A. Bosco, Jr.,** a defendant in this case is an Attorney at Tiffany and Bosco, P.A., an Arizona based corporation.

## FACTUAL ALLEGATIONS

11. The Debtor filed a petition (the "Petition") in the United States Bankruptcy Court, District of Arizona, seeking relief under Chapter 13 of the United States Bankruptcy Code, under Case No. 09-22225, hereinafter referred to as the "Bankruptcy Case".
12. Edward J. Maney, (the "Trustee) has been appointed as the Trustee in this Bankruptcy Case.
13. WELLS FARGO BANK, N.A. as Trustee under Pooling and Servicing Agreement Dated as February 1, 2006, Securitized Asset Back Receivables LLC Trust 2006-FR-1 Mortgage Pass-Through Certificates, Series 2006-FR1 (hereinafter Wells) filed a motion for relief from the bankruptcy stay in this case, claiming a right to possession of the Madison property.
14. MERS has made no claim in this case.
15. Fremont Investment and Loan Company has made no claim in this case.

16. HomEq Servicing Corporation has made no claim in this case.

17. Ticor Title Agency of Arizona, Inc, has made no claim in this case.

18. Michael A. Bosco, Jr. has made no claim in this case however, Tiffany and Bosco, PA. are representing Wells Fargo in the Chapter 13 proceedings.

19. The property described in paragraph no. 4 is hereinafter referred to as the "Madison property".

20. This is an adversary proceeding to determine the validity of the Defendants' interest in the Madison property, if any, to quiet title and also to determine the penalty for fraud perpetrated by Defendants, and to determine the validity of a lien on real property which is the subject of this adversarial proceeding.

21. Wells intentionally filed a motion for relief from the bankruptcy stay in this case, claiming a right to possession of the Madison property.

22. The Debtor filed the above-captioned Chapter 13 case, listed the defendants as unsecured creditors, and disputed the debt.

23. Wells Fargo has not filed a proof of claim.

24. Wells Fargo filed a Motion to Lift the Stay and attached, as its proof of perfection of a security interest, an unofficial copy of the Trustee's Deed Upon Sale which names Wells as the "Grantee," and obtained via a fraudulent Trustee Sale,

25. No Promissory Note was attached, certified copy or otherwise.

26. The fraudulent trustee sale was held by Michael A. Bosco, Jr. who is the Substitute Trustee appointed by Wells Fargo, who is the substitute beneficiary alledgedly appointed by MERS.

27. Wells Fargo was substituted as beneficiary with a fraudulent Assignment of Deed of Trust.

28. The Assignment of Deed of Trust, dated January 17, 2008 and never duly recorded until September 5, 2008, was NOT signed by a representative of Mortgage Electronic Registration System, Inc.(hereinafter MERS). It was signed by: Jennifer Hamlin, who represented herself as Assistant Secretary to Mortgage Electronic Registration Systems, Inc.

29. Jennifer Hamlin is an employee of Tiffany & Bosco. Tiffany & Bosco is not a member of Mortgage Electronic Registration System, Inc. and is therefore not allowed under Mortgage Electronic Registration System, Inc. to represent Mortgage Electronic Registration System, Inc. in signing this document. The Notary on the Assignment of Deed of Trust is Samuel Gomez. Samuel is also an employee of Tiffany & Bosco, and should have first hand knowledge that Jennifer Hamlin was not an Assistant Secretary of Mortgage Electronic Registration Systems, Inc. Therefore, the Assignment of Deed of Trust is Void on its face (and an act of Fraud on the Debtor and This Honorable Court). Because it is the Assignment of Deed of Trust that would have given Wells Fargo Bank N.A. the authority to sign the Substitution of Trustee, dated January 30, 2008 and recorded March 20, 2008, that document is also Void on its face. Because it is the Substitution of Trustee that would have given Michael A. Bosco, Jr. the authority to file the Notice of Trustee's sale, that document is also Void on its face. Because it is the Notice of Trustee's sale that would have given Michael A. Bosco, Jr. the authority to hold the Trustee's sale and ultimately sign the Trustee's Deed Upon Sale, both of those actions are Void. All of the notices regarding the trustee sale were defective and Defendant's attorney failed to ensure that they represented, appointed and were retained by the real party

in interest.

30. Michael A Bosco, Jr. had no authority to issue any notices and/or sales regarding debtor's property because Wells Fargo Bank, N.A is not and was not the real party in interest. Tiffany & Bosco had a duty to exercise due diligence and good faith in the filing of their Forcible/Special Detainer Complaint. Debtor alleges that Tiffany & Bosco had no authority to bring this or any action, therefore, until it is proven that Wells Fargo Bank N.A. is the true Creditor their request to lift the Automatic Stay must be denied.

31. The Trustee Sale took place while there was a Lis Pendens filed and recorded against the property. Defendant Wells' attorney, Tiffany & Bosco, was well aware of the pending Federal lawsuit regarding proper title and ownership as they were noticed and appeared in the case.

32. Wells Fargo and Mortgage Electronic Registration Systems, Inc. are not the holder in due course of the original promissory note, and its Allonge or stamp which shows all of the holders in due course. The original note was requested on more than one occasion by the Plaintiff to be produced by the Defendants but the Defendants have not complied.

33. The Defendants, Wells, MERS, Fremont, HomEq, Ticor, Bosco, are not the holder of the original real estate contract, are not a party to it, and cannot demonstrate a right to collect on the Note or foreclose on the property.

34. Wells Fargo directed Bosco to foreclose on the Madison property without first having the original Promissory Note in its possession.

35. The Defendants Wells, MERS, Fremont, HomEq, Ticor, Bosco are not the holders of the original Promissory Note, the original Deed of Trust, or the original Real Estate Contract, and cannot produce the originals of any of these documents.

36. The Promissory Note dated September 6, 2005 was paid in full.

37. The payment in full of any debt underlying the Promissory note, Deed of Trust and Real Estate Contract with regard to the Madison property, constitutes refusal of tender of payment, and means the obligation is paid in full.

38. Despite being paid in full, the original note was sold at a time unknown to Debtors.

39. The original Promissory Note was not returned to debtors.

40. A claim for recoupment on the note has been made.

41. The Assignment of Deed of Trust was not released by Wells Fargo, MERS, nor anyone else, and no Release of Lien was received by Debtors.

**CAUSES OF ACTION**

**COUNT ONE**

**Inability to Demonstrate Legal Right to Foreclose and/or Collect Payments on Non-existent Loan**

42. The allegations of paragraphs 1-41 above are realleged and incorporated herein by reference.

43. Wells Fargo, MERS, Fremont, HomEq, Ticor, Bosco are not now and never have been in possession of, and are not now and never have been the holders of the original promissory note at issue in this matter, and cannot produce the original note and the accompanying Allonge.

44. Wells Fargo, MERS, Fremont, HomEq, Ticor, Bosco are not now and never have been in possession of, and are not now and never have been the holders of the original Deed of Trust at issue in this matter and cannot produce it.

45. Wells Fargo, MERS, Fremont, HomEq, Ticor, Bosco are not now and never have been in possession of, and are not now and never have been the holder of the original Real Estate Contract evidencing the agreement between the Seller and Debtor, and cannot produce it.

46. The original lenders have been paid the full amount of the promissory note.

47. Wells Fargo, MERS, Fremont, HomEq, Ticor, Bosco are not the Note Holder as described in the Promissory Note.

48. Only the Note Holder as described in the Promissory Note is the real party in interest.

49. Only the holder of the complete original Promissory Note (including its Allonge) has a claim on the Madison property.

50. The original promissory note has been sold, and has been placed in a security where it is currently making a profit for the holder of the original note.

51. The sale of the Promissory Note evidences that the holder of the complete original note has been paid on it from another source. In addition, it demonstrates that the real Note Holder has not only been paid on the note, but is continuing to make a profit from the Note without authorization. Thus, there is nothing owing on the Promissory Note.

52. If any of the Defendants actually own the original note, and can produce it with the accompanying Allonge, then that Defendant will also be required to produce records of account for the purpose of a forensic accounting, to determine how much of the funds made by the holder are owed to Debtor.

## COUNT TWO

### Recoupment

53. The allegations of paragraphs 1-52 above are realleged and incorporated herein by reference.

54. This claim for recoupment arises out of the transaction or occurrence that is the subject matter of the Defendants' Notice of Claim, as well as previous payments made to Defendants.

55. Debtor paid the Defendants monies and is entitled to recoupment of said funds, as the Defendants are not the Note Holder.

56. Debtor is entitled to recoupment of said funds, as Defendants are not the Note Holder.

57. The Defendants failed to forward funds received from Debtor to the Note Holder.

58. The debtor is entitled to recoupment of said funds, as the Defendants are not the Note Holder and failed to file a proof of claim in this matter.

## COUNT THREE

### FRBP 7009(B) Fraud and FRCivP 9(b) Fraud

59. The allegations of paragraphs 1-58 above are realleged and incorporated herein by reference.

60. The Defendants intentionally and knowingly falsely represented to the Debtor, that they had the right to collect payments on the subject Promissory Note, and fraudulently assigned the note, knowing that they had no legal right to demand said payment, and knowing that the loan was based on nothing, and fraudulent.

61. On or about January 17, 2008 Wells Fargo was party to an alleged Assignment of Deed of Trust to the Madison property, knowing that the "Assignment" was fraudulent and intending it to deceive, and further knowing it was not the holder of the original promissory note, and therefore had no right to collect on said note. The assignment was fraudulent because Wells Fargo did not receive the original Promissory Note, Deed of Trust and Real Estate Contract to make the assignment valid. The execution of the document was also fraudulent because Jennifer Hamlin was not an assistant secretary or an employee of MERS. The Substitution of Trustee dated June 16, 2008 was also a sham and a fraud for the reasons stated above.

62. HomEq Servicing Corporation was fraudulently hired by Fremont Investment and Loan Company to service a loan it did not make and to pursue collection of said Note, knowing it had no legal right to do so because it was not the holder of the original Promissory Note, nor the holder of the original Deed of Trust and original Real Estate Contract. Subsequently, MERS the unauthorized beneficiary illegally assigned its beneficial interest to Wells.

63. Wells fraudulently hired Tiffany and Bosco to pursue foreclosure on the Madison property in 2008 knowing it had no legal right to do so, because Wells Fargo is not the holder of the original Promissory Note or the holder of the original Deed of Trust and original Real Estate Contract nor are they the proper beneficiary or grantee.

64. Wells Fargo and MERS are not the holder of the original Promissory Note, the original Deed of Trust and the original Real Estate Contract.

65. Wells Fargo and MERS are not the real party in interest.

66. Wells Fargo  and MERS are not the real party in interest.

67. Fremont and HomEq collected payments on a promissory note to which it was not entitled to collect, because it is not in possession of said original promissory note, original Deed of Trust, and original Real Estate Contract, and cannot produce same.

68. Homeq Servicing, as claimed servicer has no greater rights with regard to collection of said Promissory Note, than Fremont.

69. HomEq fraudulently represented that it was the note holder, when in fact it was not, and sought to collect payments on same note, without being the original note holder.

**COUNT FOUR**

**FRBP 7009(B) Fraud and FRCivP 9(b) Fraud**

70. The allegations made in paragraphs 1 through 69 are made a part hereof in their entirety.

71. The Defendants have not filed proof of claim in this case.

72. Wells Fargo makes the following false claims: (1) monies were loaned to Debtor; (2) that Debtor incurred a debt and (3) that Wells has a secured claim.

73. Fremont Investment and Loan Corporation had been paid at closing as evidenced by GAAP (General Accepted Accounting Principles) and would be supported by a forensic audit.

74. Fremont Investment and Loan Corporation intentionally failed to forward payment in full on the proof of claim to the proper party, the holder of the original promissory note, the original Deed of Trust and the original Real Estate Contract.

75. Despite having no Proof of Claim, Wells Fargo continues to intentionally and fraudulently pursue relief from the bankruptcy stay in order to allow possession on the property at issue in this case.

## COUNT FIVE

### Violation of Fair Debt Collection Practices Act

76. The allegations made in paragraphs 1 through 75 are made a part hereof in their entirety.

77. Defendants violated the FDCPA 15 U.S.C. 1692 e(2), by misrepresenting the character, amount and legal status of Debtors' alleged debt.

70. Defendants violated the FDCPA 15 U.S.C. 1692 e(5) and 1692 f(6), by foreclosing on the Madison property and attempting to sue for right to possession, even though Defendants have no present right to possession of the Madison property, as they have no real ownership interest in said property, and by threatening to take other action prohibited by law.

71. The Defendant's violated the FDCPA, 15 U.S.C. 1692 g(a)(1), by failing to accurately and fully state in communications to Debtor, "the amount of the debt".

72. Debtor was denied due process of law. The Defendants engaged in unfair trade practices involving non-compliance with TILA, disclosure violations pursuant to revised article 9 UCC, missing disclosure statement pursuant to 15 USC 1638, missing disclosure pursuant to 12 CFR 226, right to rescind violations pursuant to 12 CFR 226.23(b)(1), as well as right to cancel violations, deceptive grouping pursuant to 12 CFR 226.17(a), incomplete or incorrect good faith estimate pursuant to 12 CFR 226.18, consumer statements missing pursuant to 12 CFR 226.18, disclosure violations pursuant to 15 USC 1601 Et., Seq., and regulation Z part 226.4 and .5, failure to disclose calculation of PMI balance pursuant to 12 CFR 226.18, failure to disclose itemization of charges pursuant to 12 CFR 226.21, failure to disclose inflated PMI based on derogatory credit information as required by the Fair Credit

Reporting Act 15 USC 1681 Et. Seq., failure to disclose date in violation of 12 CFR 226.18, failure to provide copies of deed of trust documents in violation of 15 USC 1601 Et. Seq., failure to obtain signed loan documents in violation of 15 USC 1601 Et. Seq., and regulation Z part 226 Et. Seq., violation of settlement procedure pursuant to 12 USC 2601 Et. Seq., failure to give three day cooling in violation of 15 USC 1601 and regulation Z part 226, failure to give conspicuous writings in violation of 15 USC 1601, 1681 and 12 CFR 226.18, notice in violation of 12 USC 2601, 1601, 12 CFR 226.18.

**COUNT SIX**

**QUIET TITLE**

73. The allegations made in paragraphs 1 through 72 are made a part hereof in their entirety.

74. Debtor is asserting an interest in the property by claiming that the Defendants did not have the authority to foreclose.

75. None of the defendants have any right, title, interest, or claim in or to the property in question which is owned by the Debtor.

76. The Plaintiff is entitled to recover its attorney's fees incurred in this matter.

**DEMAND FOR RELIEF**

WHEREFORE, the Plaintiff, requests that this Court:

a. Assume jurisdiction over this action;

b. Declare that Defendants have no valid and legal interest in the Madison property, have no claim on said property, and cannot foreclose on or possess same;

c.  Enjoin Defendants from collecting or attempting to collect any charges incurred with regard to this action;

d.  Order the Disallowance of the fraudulent Trustee's Deed Upon Sale filed by Wells Fargo and reduce the amount any claim to be filed by them to zero.

e.  Declare that Defendants, Fremont, HomEq, Wells, MERS, Ticor, Bosco are not the real party in interest;

f.  Declare that Defendants had no legal authority to pursue foreclosure and subsequently right to possession on the Madison property; and direct the Defendants to record a Release of Deed of Trust with the Maricopa County Recorder fully releasing all claimed interest in said property;

g.  Declare Wells Fargo filed a false Trustee's Deed Upon Sale and penalize them by fining them $50,000.00, and sentencing the person who knowingly filed that Trustee's Deed Upon Sale to imprisonment for 1 year, pursuant to 18 U.S.C. 152 and 3571;

h.  Declare Defendants guilty of fraud, and enjoin them from engaging in any further fraudulent acts with regard to Debtor.

i.  Declare Defendants received payment in full on the Promissory Note at issue in this case.

j.  Order Defendants to release their Trustee's Deed Upon Sale on the property and to properly record a release of lien / Deed of Trust with the Maricopa County Recorder.

k.  Award actual damages, including and not limited to a recoupment of all amounts paid to Defendants in the form of monthly payments.

l. Declare that Defendants violated the FDCPA, TILA, RESPA and enjoin them from committing any future violations of the Act, and award Debtors actual damages and $1,000 in statutory damages pursuant to 15 U.S.C. §1692K;

m. Quieting title to the property in favor of the Debtor and against Defendants and all persons claiming under or through them;

n. Forever barring and estopping Defendants from claiming any interest in the property and adverse to the Debtors including possession;

o. Grant such other and further relief as is appropriate.

Respectfully submitted this 19th day of November, 2009

Richard E. Clark, Attorney for Sherryl Madison,

Sherryl Madison, Plaintiff

ACKNOWLEDGEMENT

State of Arizona )ss
County of Maricopa )

On November 19, 2009, before me, a Notary Public, personally appeared Sherryl Madison who proved to me, on the basis of satisfactory evidence, to be the person whose name is subscribed to the within instrument, and acknowledged to me that she signed the same of her own free will and deed. I certify under penalty of perjury under the laws of the State of Arizona, that the foregoing is true and correct.

Witness my hand and official seal.

"OFFICIAL SEAL"
Rebecca Perez
Notary Public - Arizona
Maricopa County
My Commission Expires 8/26/2013

Rebecca Perry

Notary Public for Arizona

My Commission Expires: 8/26/2013

NOV-18-2009 12:33 From: To:18772106685 Page:1/8

# ADJUSTABLE RATE NOTE

**(6-Month LIBOR Index - Rate Caps)**
**(Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

September 6, 2005 [Date] BREA, CA 92821 [City] [State]

522 EAST GLENDALE AVENUE PHOENIX, AZ 85020

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 750,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FREMONT INVESTMENT & LOAN

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.750 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

*SEE ADJUSTABLE RATE NOTE RIDER ATTACHED HERETO AND MADE A PART HEREOF*

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on November 1, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2727 EAST IMPERIAL HIGHWAY, BREA CA 92821

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 4,843.75. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index (Assumable during Life of Loan) (First Business Day Lookback) - Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP-815N (0404) Form 5520 3/04

VMP Mortgage Solutions (800)521-7291

Page 1 of 4 Initials: ________



*SEE ADJUSTABLE RATE NOTE RIDER ATTACHED HERETO AND MADE A PART HEREOF*

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of October 1, 2007, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and Four Hundred Seventy-Three Thousandths percentage points ( 6.4737 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.750 % or less than 7.7500 %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than 1.5000 from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than 13.7500 % or less than 7.7500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

*SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF*

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a Prepayment. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.0 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

***SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF***

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

SHERRYL L MADISON (Seal) -Borrower | _______________ (Seal) -Borrower

_______________ (Seal) -Borrower | _______________ (Seal) -Borrower

_______________ (Seal) -Borrower | _______________ (Seal) -Borrower

_______________ (Seal) -Borrower | _______________ (Seal) -Borrower

*[Sign Original Only]*

# PREPAYMENT RIDER TO NOTE

This Prepayment Rider is made this 6th day of September, 2005, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note ("Note") made by the undersigned (the "Borrower") to

FREMONT INVESTMENT & LOAN

(the "Lender") of the same date and covering the property located at:

522 EAST GLENDALE AVENUE PHOENIX, AZ 85020

(Property Address)

## BORROWER'S RIGHT TO PREPAY

This Prepayment Rider Supersedes Section 5 of the Note

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full or partial prepayment; however, the Note Holder may charge me for the privilege of prepayment. If more than 20% of the original principal amount of this note is prepaid in any 12-month period within 2 years after the date of this loan, I agree to pay a prepayment charge equal to six months interest on the amount prepaid which is in excess of 20% of the original principal amount of this Note. If I make prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make full prepayment at any time.

Sherryl L Madison 9/6/05

SHERRYL L MADISON Date

_________________________ Date

_________________________ Date

_________________________ Date

# RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE

THIS RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE is made this 6th day of September, 2005, and is incorporated into and shall be deemed to amend, and supplement the Adjustable Rate Note dated September 6, 2005 given by the undersigned (the "Borrower") to FREMONT INVESTMENT & LOAN

(the "Lender") of the same date and covering the Property located at:
522 EAST GLENDALE AVENUE PHOENIX, AZ 85020

(Property Address)

**A. Section 3 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:**

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on November 1, 2005.

Before the First Principal and Interest Payment Due Date, as described in Section 4(G) of this Note, on each payment due date my monthly payment will equal one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the same day one month prior to the payment due date at the interest rate that is provided for in accordance with Section 2 and Section 4 of this Note.

Beginning on the First Principal and Interest Payment Due Date, I will make monthly payments of principal and interest. These payments will be calculated as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal, interest and any other charges that I may owe under this Note.

Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on October 1, 2035 I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2727 EAST IMPERIAL HIGHWAY, BREA CA 92821

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My initial monthly payment will be in the amount of U.S. $ 4,843.75. This amount will change.

**(C) Monthly Payment Changes**

Before the First Principal and Interest Due Date, my monthly payments will change to reflect changes in the unpaid principal balance of this Note. In addition, following the first Change Date, my monthly payments will change to reflect changes in the interest rate that I must pay.

Beginning with the First Principal and Interest Due Date, my monthly payment will change to include both principal and interest. In addition, my monthly payment will change to reflect changes in the unpaid principal balance of this Note and changes in the interest rate that I must pay.

**B. Section 4 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:**

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of October 1, 2007, and the adjustable interest rate I will pay may change on that day every sixth month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR"), which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin, as defined below. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and Four Hundred Seventy-Three Thousandths percentage point(s) ( 6.4737 %) (the "Margin") to the Current index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) of this Note, this rounded amount will be my new interest rate until the next Change Date.

For each Change Date prior to the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that is equal to one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the Change Date at my new interest rate. The result of this calculation will be the new amount of my monthly payment until the monthly payment changes again in accordance with this Note.

For each Change Date beginning with the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date, together with interest at my new interest rate, in substantially equal installments. The result of this calculation will be my new monthly payment until the monthly payment changes again in accordance with this Note.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.750 % or less than 7.7500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one and one-half percentage points (1.50%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 13.7500 % or less than 7.7500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment due date after each Change Date until the amount of my monthly payment changes again.

**(F) Effective Date of Changes**

The Note Holder will deliver or mail to me such notice of changes in my interest rate and the amount of my monthly payments as may be required by law. The notice will include information required by law to be given to me, and also the telephone number of a person who will respond to any question I may have regarding the notice.

**(G) First Principal and Interest Payment Due Date and First Principal and Interest Change Date**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be November 1, 2010 . The Change Date immediately preceding the First Principal and Interest Payment Due Date is called the "First Principal and Interest Change Date."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Adjustable Rate Note for Temporary Interest-Only Payment Schedule.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Sherryl L Madison (Seal) ______________________ (Seal)
SHERRYL L MADISON

______________________ (Seal) ______________________ (Seal)

Recorded At the Request Of
Ticor Title Agency of Arizona, Inc.
27008284

Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA 92834-34078

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20051356922 09/15/2005 01:17
ELECTRONIC RECORDING

27008284-18-6-6--
Leonardil

Prepared By:
BARBARA LICON

5/5 3/3

1000273716

[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN 1001944-1000273716-6

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 6, 2005 , together with all Riders to this document.
(B) "Borrower" is SHERRYL L MADISON, A MARRIED WOMAN SOLE AND SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument. Borrower's mailing address is 522 EAST GLENDALE AVENUE , PHOENIX, AZ 85020
(C) "Lender" is FREMONT INVESTMENT & LOAN

Lender is a CORPORATION
organized and existing under the laws of CALIFORNIA

Lender's mailing address is **2727 EAST IMPERIAL HIGHWAY, BREA CA 92821**

(D) **"Trustee"** is **TICOR**

. Trustee's mailing address is

**7337 W BELL RD**
**PEORIA, AZ 85382**

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated **September 6, 2005**
The Note states that Borrower owes Lender **Seven Hundred Fifty Thousand and No/100** ------------------------------------------------ Dollars (U.S. $ **750,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 1, 2035**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

**County** of **MARICOPA**

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

~~LOT 22, DIANA ESTATES, ACCORDING TO BOOK 18 OF MAPS, PAGE 45, RECORDS OF MARICOPA COUNTY, ARIZONA.~~

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Parcel ID Number: **160 30 027B** which currently has the address of

**522 EAST GLENDALE AVENUE** [Street]

**PHOENIX** [City], Arizona **85020** [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: ______

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials:

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials:

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: [signature]

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials:

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: ____

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: [signature]

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________________ (Seal)
SHERRYL L MADISON -Borrower

_______________________

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

_______________________ (Seal)
-Borrower

**STATE OF ARIZONA,** Maricopa **County ss:**

The foregoing instrument was acknowledged before me this 10th day of Sept. 2005 by Sheryl L Madison

My Commission Expires: 7-24-08

Notary Public

OFFICIAL SEAL
SHERRI DEROSIER-BITTING
NOTARY PUBLIC - STATE OF ARIZONA
MARICOPA COUNTY
My Comm. Expires July 24, 2008

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 6th day of September, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to FREMONT INVESTMENT & LOAN

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
522 EAST GLENDALE AVENUE PHOENIX, AZ 85020

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. Sections 3 and 4 of the Note state as follows:**

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment on the first day of every month, beginning on November 1, 2005. Before the First Principal and Interest Payment Due Date, as described in Section 4 of this Note, my payment will equal one-twelfth of one year's interest that would be due on an amount equal to the unpaid principal balance of the Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal, interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on October 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2727 EAST IMPERIAL HIGHWAY, BREA CA 92821 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My initial monthly payment will be in the amount of U.S. $ 4,843.75. However, if I make a partial principal prepayment prior to the first Change Date, my monthly payment will decrease for the remainder of the term that my scheduled payments consist only of interest.

**(C) Monthly Payment Changes**

Beginning with the First Principal and Interest Due Date, my monthly payment will change, as described in Section 4 of this Note. The Note Holder will notify me prior to the date of changes in my monthly payment.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first

day of **October 1, 2007** , and the adjustable interest rate I will pay may change on that date every sixth month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of Interbank offered rates for six-month U.S. dollar-denominated deposits in the London market based on quotations of major banks based on the London Interbank Offered Rate ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin, as defined below. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Four Hundred Seventy-Three Thousandths** percentage points (6.4737 %) (the "Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4 (D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.750 % or less than 7.7500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **One and One-Half** percentage point(s) (1.5000 %) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than 13.7500 % or less than 7.7500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after each Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not an natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

Sherryl L Madison 9/6/05

Borrower **SHERRYL L MADISON** Date

Borrower Date

Borrower Date

Borrower Date

WHEN RECORDED MAIL TO:

RECORDED
MAR 2 0 2008

Tiffany & Bosco, P.A.
Michael A. Bosco, Jr.
2525 E. Camelback Rd.
Ste. 300
Phoenix, AZ 85016

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Loan No. 0324628239

# SUBSTITUTION OF TRUSTEE

08-01132 Madison

WHEREAS, **Sherryl L. Madison, a married woman sole and separate property** was the original Trustor(s), **Ticor** was the original Trustee and **Mortgage Electronic Registration Systems, Inc.** was the original Beneficiary under that certain Deed of Trust dated **09/6/05** and recorded on 09/15/2005 as Recording No./Book-Page 2005-1356922 *, of Official Records of **Maricopa** County, State of Arizona and described as:

Lot 2, DIANA ESTATES, according to Book 48 of Maps, Records of Maricopa County, Arizona, except that portion of said Lot 2, lying Southerly of line described as follows; BEGINNING at the Northeast corner of the South 10 Feet of said Lot 2; THENCE Westerly along the North line of said South 10 feet to the West line of the East 90.48 feet of said Lot; THENCE Westerly to a point in the West line of said Lot that is 8.10 feet Northerly of the Southwest corner thereof and the terminus of the line herein described.

PARCEL No. 2:
The West 4 feet of that part of Lot 1, DIANA ESTATES, according to Book 48 of Maps, Page 49, Records of Maricopa County, Arizona lying South of the Easterly prolongation of the North line of Lot 2, Diana Estates
Except the South 10 feet thereof.

*Re-Recorded on 02/26/2008 in Instrument No. 2008-0165882

WHEREAS, the undersigned present beneficiary under the said Deed of Trust hereby appoints **Michael A. Bosco, Jr., whose address is 2525 East Camelback Road, Suite 300, Phoenix, Arizona 85016,** as **Successor Trustee** under said Deed of Trust, and is qualified to act as Successor Trustee per ARS Section 33-803 (A)2, as a member of the Arizona State Bar.

Wells Fargo Bank, NA, as Trustee By Barclays Capital Real Estate, Inc., dba HomEq Servicing, as Attorney in Fact

By: **Noriko Colston**
Its : Assistant Secretary

State of ________________)

County of ______________)

On this day _______ of ______________, 20___ , before me the undersigned, Notary Public, personally appeared ____________________________________ who acknowledged that he/she is the ____________________________ of the above corporation and that he/she executed the within instrument in behalf of said corporation as Beneficiary, being authorized so to executed.

_______________________ _______________
Notary Public Exp. date

State of California }
County of Sacramento } ss.

On January 30, 2008, before me, J. Gualano, Notary Public, personally appeared Noriko Colston, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Notary signature

J. GUALANO
COMM. # 1607324
NOTARY PUBLIC-CALIFORNIA
SACRAMENTO COUNTY
COMM. EXP. SEP 18, 2009

RECORDED

MAR 2 0 2008

WHEN RECORDED MAIL TO:

**TIFFANY & BOSCO, P.A.**
Michael A. Bosco, Jr.
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016

0324628239/0324628239
Title No: G803446
FHA/VA No.:

# NOTICE OF TRUSTEE'S SALE
## File ID. #08-01132 Madison

Notice is hereby given that **Michael A. Bosco, Jr., Attorney at Law,** as trustee (or successor trustee, or substituted trustee), pursuant to the Deed of Trust which had an original balance of **$750,000.00** executed by **Sherryl L. Madison, a married woman sole and separate property, 522 E. Glendale Ave., Phoenix, AZ 85020,** dated **September 6, 2005** and recorded **September 15, 2005**, as Instrument No./Docket-Page **2005-1356922** * of Official Records in the office of the County Recorder of **Maricopa** County, State of Arizona, will sell the real property described herein by public auction on **June 19, 2008 at 10:00 A.M. at the office of Michael A. Bosco, Jr., Third Floor Camelback Esplanade II, 2525 East Camelback Road, in the City of Phoenix, County of Maricopa, State of Arizona,** , to the highest bidder for cash (in the forms which are lawful tender in the United States and acceptable to the Trustee, payable in accordance with ARS 33-811A), all right, title, and interest conveyed to and now held by it under said Deed of Trust, in the property situated in said County and State and more fully described as:

*Re-Recorded on 02/26/2008 in Instrument No. 2008-0165882

PARCEL NO. 1:

Lot 2, DIANA ESTATES, according to Book 48 of Maps, Records of Maricopa County, Arizona, EXCEPT that portion of said Lot 2, lying Southerly of line described as follows; BEGINNING at the Northeast corner of the South 10 Feet of said Lot 2; THENCE Westerly along the North line of said South 10 feet to the West line of the East 90.48 feet of said Lot; THENCE Westerly to a point in the West line of said Lot that is 8.10 feet Northerly of the Southwest corner thereof and the terminus of the line herein described.

PARCEL No. 2:

The West 4 feet of that part of Lot 1, DIANA ESTATES, according to Book 48 of Maps, Page 49, Records of Maricopa County, Arizona lying South of the Easterly prolongation of the North line of Lot 2, Diana Estates

Except the South 10 feet thereof.

The street address/location of the real property described above is purported to be:

The beneficiary under the aforementioned Deed of Trust has accelerated the Note secured thereby and has declared the entire unpaid principal balance, as well as any and all other amounts due in connection with said Note and/or Deed of Trust, immediately due and payable.

Said sale will be made in an "as is" condition, but without covenant or warranty, express or implied, regarding title, possession or encumbrances, to satisfy the indebtedness secured by said Deed of Trust, advances thereunder, with interest as provided therein, and the unpaid principal balance of the Note secured by said Deed of Trust with interest thereon as proved in said Note, plus fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust.

Current Beneficiary:
Wells Fargo Bank, NA, as Trustee
Care of / Servicer
HomeEq Servicing Corporation
1270 Northland Drive, Suite 200
Mendota Heights, MN 55120

Current Trustee:
Michael A. Bosco, Jr.
2525 East Camelback Road, Suite 300
Phoenix, Arizona 85016
(602) 255-6000

Dated : March 20, 2008

Michael A. Bosco, Jr., Attorney at Law
Trustee/Successor Trustee, is qualified per ARS Section 33-803 (A)2 as a member of The Arizona State Bar

STATE OF ARIZONA)
) ss.
County of Maricopa )

This instrument was acknowledged before me on 03/20/08, by MICHAEL A. BOSCO, JR., Attorney at Law, as Trustee/Successor Trustee.

My Commission Expires:

OFFICIAL SEAL
PAULA GRUNTMEIR
NOTARY PUBLIC State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct 23 2011

Paula Gruntmeir, Notary Public
Commission expiration is 10/23/2011 12:00:00 AM

NOTICE: This proceeding is an effort collect a debt on behalf of the beneficiary under the referenced Deed of Trust. Any information obtained will be used for that purpose. Unless the loan is reinstated, this Trustee's Sale proceedings will result in foreclosure of the subject property.

**EXHIBIT A**

**STATEMENT OF BREACH OR NON-PERFORMANCE**
**FILE NO: 08-01132 Madison**

A breach or non-performance of the Deed of Trust referred to in the attached Notice of Trustee s Sale (which Deed of Trust is dated 09/6/05 and recorded at Recorder s Number/Docket-Page 2005-1356922 * , in the office of the **Maricopa** County Recorder) or of the promissory note/contract secured thereby, or both, has occurred by reason of the following:

Failure to make the monthly payments of $4,843.75 each, from 10/01/07 and all subsequent installments;

PLUS ALL ACCRUING PAYMENTS, LATE CHARGES, ADVANCES, TAXES, RENTS PAYMENTS ONPRIOR LIENS, FEES, COSTS, INTEREST, EXPENSES, AND ANY OTHER DEFAULT THAT MAY OCCUR, ETC.

The Beneficiary under said Deed of Trust has accelerated the Note secured thereby and has declared the entire unpaid principal balance, as well as any and all other amounts due in connection with said Note/Deed of Trust, immediately due and payable. The beneficiary has elected to sell, or cause to be sold, the property described in the Notice of Trustee s Sale.

All persons whose interest in the trust property is subordinate in priority to that of the above-mentioned Deed of Trust are hereby advised that their INTEREST MAY BE TERMINATED BY THE TRUSTEE S SALE.

*Re-Recorded on 02/26/2008 in Instrument No. 2008-0165882

Wells Fargo Bank, NA, as Trustee By Barclays Capital Real Estate, Inc., dba HomEq Servicing, as Attorney in Fact

By: Noriko Colston
Its: Assistant Secretary

Loan No.: 0324628239

State of ____________)

County of ____________)

On this day ______ of ____________, 20___ , before me the undersigned, Notary Public, personally appeared ______________________ who acknowledged that he/she is the ______________________ of the above corporation and that he/she executed the within instrument in behalf of said corporation as Beneficiary, being authorized so to executed.

Notary Public ____________ Exp. date ____________

OFFICIAL RECORDS OF
Unofficial
Document

WHEN RECORDED MAIL TO:

TIFFANY & BOSCO, P.A.
Michael A. Bosco, Jr.
2525 East Camelback Road, Suite 300
Phoenix, AZ 85016

## ASSIGNMENT OF DEED OF TI

Loan No. 0324628239
Parcel No.

T & B No.: 08-01132

For Value Received, the undersigned corporation hereby grants, assigns and transfers to **Wells Fargo Bank, NA, as Trustee** at the address of 4837 Watt Ave., Suite 100 North Highlands, CA 95660 all beneficial interest under that certain Deed of Trust dated **September 6, 2005** executed by **Sherryl L. Madison, a married woman sole and separate property** Trustor, Ticor Trustee, **Mortgage Electronic Registration Systems, Inc.**, as Beneficiary; and recorded on **September 15, 2005** as Instrument No./Docket-Page No. **2005-1356922** * of Official Records of **Maricopa** County, AZ and legally describing the trust property as:

***Re-Recorded on 02/26/2008 in Instrument No. 2008-0165882**

**PARCEL NO. 1:**

**Lot 2, DIANA ESTATES, according to Book 48 of Maps, Page 49, records of Maricopa County, Arizona, EXCEPT that portion of said Lot 2, lying Southerly of line described as follows; BEGINNING at the Northeast corner of the South 10 Feet of said Lot 2; THENCE Westerly along the North line of said South 10 feet to the West line of the East 90.48 feet of said Lot; THENCE Westerly to a point in the West line of said Lot that is 8.10 feet Northerly of the Southwest corner thereof and the terminus of the line herein described.**

**PARCEL No. 2:**

**The West 4 feet of that part of Lot 1, DIANA ESTATES, according to Book 48 of Maps, Page 49, Records of Maricopa County, Arizona lying South of the Easterly prolongation of the North line of Lot 2, Diana Estates**

**Except the South 10 feet thereof.**

Together with the Note or Notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust

Date : January 17, 2008 Effective January 17, 2008

Mortgage Electronic Registration System, Inc.

By:
Its: Jennifer Hamlin- Assistant Secretary

20080773080

STATE OF Arizona )
)ss.
COUNTY OF Maricopa )

On this 17 day of January, 2008, before me, the undersigned, a Notary Public for said State, personally appeared Jennifer Hamlin known to me to be the Assistant Secretary of the above corporation, and acknowledge execution of the above instrument on behalf of the corporation.

My Commission Expires:

Notary Public

OFFICIAL SEAL
SAMUEL GOMEZ
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Sept. 24, 2011

Unofficial Document